**UNITED STATES**

v.

**Robert K. SIMMONS, 502 88 1961, Interior Communications Electrician Third Class (E–4), U.S. Navy.**

**NMCM 84 3690.**

U.S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 18 June 1982.

Decided 30 Jan. 1985.

LCDR Frederick N. Ottie, JAGC, USN, Appellate Defense Counsel.

LCDR Harold M. Shaw, JAGC, USN, Appellate Defense Counsel.

LT Brian D. Saunders, JAGC, USNR, Appellate Government Counsel.

Before GORMLEY, Chief Judge, and MAY and RAPP, Judges.

MAY, Judge:

We have examined the record of trial, the record of the subsequent evidentiary hearing, the assignments of error and the government's reply thereto and have concluded that the findings and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the accused was committed. Appellant's first assignment of error, however, requires discussion:

> THE MILITARY JUDGE ERRED BY FINDING THAT APPELLANT DID NOT SUFFER ANY LEGAL PREJUDICE AS A RESULT OF THE EXCESSIVE POST–TRIAL DELAY IN THIS CASE WHICH AMOUNTED TO 535 DAYS AT THE TIME THE SUPERVISORY AUTHORITY ORDERED AN EVIDENTIARY HEARING, WAS 712 DAYS ON THE DATE OF THE EVIDENTIARY HEARING, AND WAS 766 DAYS ON THE DATE OF THE SUPERVISORY AUTHORITY'S ACTION.

■ We first find that the offense in this case was not minor in nature. Appellant, a third class petty officer, was convicted of the transfer of 13 grams of marijuana to a fellow petty officer stationed aboard his ship. Dismissal of such a charge solely because of delay in the appellate processing of a case is a remedy disproportionate to the defect. *United States v. Clevidence*, 14 M.J. 17, 19 (C.M.A.1982).

We have also examined the record of the evidentiary hearing ordered by the supervisory authority to determine the cause of the delay in the forwarding of the trial record by the convening authority. Appellant's ship, a guided missile cruiser, was, at the time the record of trial was placed into the postal system for transmittal to the supervisory authority, deployed in the Western Pacific on picket station some 100 miles ahead of its main task group. Mail deliveries and disptaches were at intervals of two-three weeks. The designated legal officer responsible for the mailing and monitoring of the trial record processing was the ship's Anti-Submarine Warfare Officer. The duty of ship's legal officer was, as is usual for shipboard officers, a collateral duty assignment. This collateral duty legal officer did not maintain an administrative tracking system to monitor the receipt of the trial record at the supervisory authority's headquarters located in San Diego, several thousand miles away.

■ None of these circumstances, more indicative of unintentional negligence and lack of training in collateral duties, represents acceptable justification for the delay in the eventual receipt of the trial record by the supervisory authority. They are significant, however, in the determination of the character of the delay. As the military court of review for the Naval Services, we bring to our evaluation of this situation an appreciation and awareness of the operational demands placed upon deployed combatant vessels and the logistic difficulties resident in such operational environments. While we find no *justification* for the failure to monitor the transmittal of the trial record from the USS JOUETT to COM-NAVSURFPAC, we find, after examination of the circumstances, no purposeful actions or oppressive design by the government to delay the appellate processing of this case.

■ We are less sanguine regarding the lesser, but far more inexplicable, period of delay in the review of this case below. On 21 December 1983, the supervisory authority, COMNAVSURFPAC, forwarded the duplicate original record of trial to Naval Station, San Diego, via the convening authority, USS JOUETT, directing the aforementioned evidentiary hearing. The endorsing letter (with the trial record) was not forwarded from the JOUETT until *18 April 1984*, some 118 days later. We find no explanation in the record of the evidentiary hearing to explain this delay in processing by the JOUETT, then returned from deployment, beyond an assertion in the forwarding letter that the "original letter [from COMNAVSURFPAC] was not received by this command." We find this period of 118 days between the ordering of an evidentiary hearing to determine the cause of an earlier delay of 535 days to be a totally unacceptable response to the dictates of the Code and the demands of the Naval Services' military justice system. This latter period of 43 days between the date of the forwarding endorsement by the JOUETT and the actual hearing would be sufficient, in and of itself, to support drastic remedial action by this Court upon evidence of prejudice.

We, however, find no evidence of the prejudice asserted by appellant in his brief before this Court. We have examined the record of the evidentiary hearing where appellant had the opportunity to present such evidence in an appropriate forum and have extracted the following testimony of appellant from that hearing:

### Direct Examination By Defense Counsel

Q. And when did you begin appellate leave?

A. August 30th.

Q. Petty Officer, where did you go, once you began appellate leave?

A. I came directly back to San Diego.

Q. Can you describe to the court, what the conditions, if any, there are, on your appellate leave status? What are you required to do?

A. I'm required to check in at the nearest installation every three months, just so they know that I'm around. And that's all they want.

.　　.　　.　　.　　.

Q. Now, Petty Officer, when you began appellate leave, how would you describe your financial situation?

A. I did have a fair amount of money in the bank, but you know, it wasn't anything. You know, enough to live on, anyway, until I got a job. It was pretty poor, actually.

Q. Did you attempt to inquire as to the possibility of obtaining unemployment benefits.

A. Yes, I did. That was the first phone call I made when I got back.

Q. And what happened?

A. I was told that I needed a DD–214 to draw any kind of benefits.

Q. Did you receive anything from the Navy; the JOUETT, SURFPAC, anybody, concerning this case?

A. Nothing. In fact, I—approximately a year ago—I can't tell you the exact date—I called my lawyer at, you know, at my court-martial, and asked him if he had heard anything. And he said he'd get back to me in about a week. He never did, so I called him back. And he said that all he knew, that it was probably in Washington somewhere, and we just had to wait and see.

Q. Do you specifically recall him saying Washington?

A. That's what he said, yes.

Q. What other attempts did you make to find out what the status of your case was?

A. That's all I did.

.　　.　　.　　.　　.

Q. One final question, Petty Officer. How would you describe the effect that this delay of almost two years has had upon you, emotionally, psychologically?

A. It's very unsettling. I mean, right now I'm nervous. I don't—no—this isn't me. It—it's not a good feeling, just, you know, waiting, not knowing what's going to be happening to you. I didn't know if I was gonna be in. I didn't know if I was, you know, gonna be out with a bad conduct discharge. You know. It's very unsettling.

DC: I have no further questions.

.　　*Cross-Examination By
Government Counsel*

Q. You indicated that when you were released from confinement in Corpus Christi, you had a fair amount of money in the bank. Do you have any memories [sic] approximately how much money there was in the bank?

A. It was about $2,000.

Q. And you came back to San Diego, and how soon after you got to San Diego did you apply for unemployment?

A. Well, that was a weekend, so it was the next Monday.

Q. And after they said that you needed a DD–214 to even apply, what did you do about finding a job?

A. I just started pounding the ground.

Q. And how long did it take you till you finally found a job?

A. A job that was acceptable, you know, to where, you know, it would support me, it took me about a month.

Q. All right. And in that month in between, were you doing odd jobs, that sort of thing?

A. No, I wasn't.

Q. Just more or less looking?

A. Yes.

Q. And have you been employed more or less continuously since that—

A. Yes, I have.

Q. —date of release? Or the one month after you got back to San Diego?

A. Right.

Q. You described the effect of this not knowing the final resolution as unsettling; emotionally unsettling, and it makes you nervous. What makes it emotionally unsettling for you?

A. It's just being held in limbo, you know. I mean, if they would have told me, "Hey, you are in," you know, "we want you to come back," which is what I originally wanted. I wanted to stay in, okay? If they would have come out and said that, I would have known. That would have been okay, you know? And I would have come back, no problem. But, you know, they didn't say anything. I don't know.

.    .    .    .    .

### Examination By the Presiding Military Judge

Q. You said it took you about a month to find a job?

A. Yes, sir.

Q. And who did you start working for at that time?

A. Utotem Markets.

Q. In San Diego?

A. Yes.

Q. How long did you work for them?

A. I've been working for them, now, it's over a year and a half, now.

Q. So, you're still working for them?

A. Yes.

Q. What do you actually do for them, now?

A. I'm managing a store in Imperial Beach.

Q. What did you start off doing?

A. I was a clerk.

MJ: I have no further questions. Does either counsel have any additional questions?

TC: No, your Honor.

DC: No, your Honor.

After consideration of the factual evidence presented relative to asserted prejudice, we reject appellant's contention. We specifically reject appellant's reliance upon *United States v. Shely*, 16 M.J. 431, 433 (C.M.A.1983), for the proposition that *any* modicum of prejudice is sufficient to mandate dismissal of the charges in this case. Whatever may have been the intended reach of the language in *Shely*, we cannot believe nor can we reasonably interpret the Court of Military Appeals' opinion in *Shely* to require the dismissal of drug trafficking charges when, as here, the asserted "prejudice" was (1) an inability because of the lack of a DD–214, to obtain unemployment benefits during the one-month period immediately following the commencement of the appellate leave period and (2) emotional tension caused by the uncertainty of being recalled to active duty.

Regarding the first, no DD–214 would have been in the possession of appellant during the period August—September 1982, approximately four months following his trial, even if the most expeditious processing of the appellate review of his case under Articles 65, 66, and 67, 10 U.S.C. § 865, 866, 867, of the Code had occurred. As to appellant's assertion of emotional unrest, we find his assertions unpersuasive, given his obvious lack of concern expressed in two phone call inquiries to his defense counsel in the span of an entire year, and his apparent unimpeded rise to store manager at his place of employment during this period, to use appellant's words, of emotional "limbo." Nor are we persuaded that the possibility of being recalled to active military service can be reasonably viewed as prejudicially "unsettling."

Accordingly, the findings of guilty and sentence, as approved on review below, are affirmed.

We commend the actions of the supervisory authority, COMNAVSURFPAC, in the decision to initiate an evidentiary hearing. That hearing provided this Court with evidence of credible and reliable character, properly tested in an adversary forum and presided over by a judicial officer. We contrast the quality of the evidence produced at this hearing with the "evidence" submitted in other cases in the form of "affidavits" and unsworn letters, all supposedly to

be relied upon in the determination of prejudice. We commend the approach taken here and recommend its use by other commands faced with similar situations, hopefully few, of delay in post-trial processing.

Judge RAPP concurs.

GORMLEY, Chief Judge (concurring):

I concur in the result.